<pre>
 1                IN THE UNITED STATES DISTRICT COURT

 2                IN AND FOR THE DISTRICT OF DELAWARE

 3                            - - -

 4
     ALLERGAN, INC.,                :   CIVIL ACTION
 5                                  :
                    Plaintiff,      :
 6                                  :
         vs.                        :
 7                                  :
     BARR LABORATORIES, INC.,       :
 8   TEVA PHARMACEUTICALS USA,      :
     INC., TEVA PHARMACEUTICAL      :
 9   INDUSTRIES LTD., and           :
     SANDOZ, INC.,                  :
10                                  :
                    Defendants.  :   NO. 09-333-SLR-MPT

11

12                           - - -

13                              Wilmington, Delaware
                                Tuesday, January 25, 2011
14                              9:30 o'clock, a.m.

15                           - - -

16   BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.

17                           - - -

18   APPEARANCES:

19
                 FISH & RICHARDSON P.C.
20               BY:  DOUGLAS E. McCANN, ESQ. and
                      A. MARTINA TYREUS, ESQ.
21

22                         -and-

23                                   Valerie J. Gunning
                                     Official Court Reporter
24

25
</pre>

```
1    APPEARANCES (Continued):

2

3                FISH & RICHARDSON P.C.
                 BY:  JUANITA BROOKS, ESQ.
4                     (San Diego, California)

5
                         -and-
6

7                FISH & RICHARDSON P.C.
                 BY:  JONATHAN E. SINGER, ESQ.
8                     (Minneapolis, Minnesota)

9
                         -and-
10

11               GIBSON DUNN & CRUTCHER LLP
                 BY:  JEFFREY T. THOMAS, ESQ.
12                    (Irvine, California)

13
                 Counsel for Plaintiff
14               Allergan, Inc.

15

16
                 PHILLIPS, GOLDMAN & SPENCE, P.A.
17               BY:  JOHN C. PHILLIPS, JR., ESQ.

18
                         -and-
19

20               WINSTON & STRAWN LLP
                 BY:  GEORGE LOMBARDI, ESQ. and
21                    KEVIN E. WARNER, ESQ.
                      (Chicago, Illinois)
22

23               Counsel for Defendants
                 Barr Laboratories, Inc.,
24               Teva Pharmaceuticals USA, Inc., and
                 Teva Pharmaceutical Industries Ltd.
25
```

```
 1   APPEARANCES (Continued):

 2

 3            DUANE MORRIS LLP
              BY:  RICHARD W. RILEY, ESQ.
 4

 5                    -and-

 6

              BRINKS HOFER GILSON & LIONE
 7            BY:  THOMAS J. FILARSKI, ESQ. and
                   MEREDITH MARTIN ADDY, ESQ.
 8                 (Chicago, Illinois)

 9

              Counsel for Defendant
10            Sandoz, Inc.

11

12                    - - -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3              (Proceedings commenced in the courtroom,

 4    beginning at 9:30 a.m.)

 5

 6              THE COURT:  Good morning, counsel.

 7              (Counsel respond, "Good morning, your Honor.")

 8              THE COURT:  Why don't we start with

 9    introductions, though many of you actually need no

10    introduction.

11              Mr. McCann?

12              MR. McCANN:  Good morning, your Honor.  Doug

13    McCann from Fish & Richardson on behalf of plaintiff

14    Allergan.  Your Honor, with me today is Juanita Brooks and

15    John Singer from Fish & Richardson, and our co-counsel,

16    Jeff Thomas, from Gibson Dunn.  Your Honor, we also have

17    with us Deborah Condino, who is a vice president and chief

18    patent counsel at Allergan.

19              THE COURT:  All right.  Thank you.

20              Mr. Phillips?

21              MR. PHILLIPS:  Good morning, your Honor.

22              THE COURT:  Good morning.

23              MR. PHILLIPS:  Jack Phillips on behalf of Barr.

24    And with me today is George Lombardi.

25              MR. LOMBARDI:  Good morning, your Honor.
```

```
 1                    MR. PHILLIPS:  From Winston & Strawn and
 2   Kevin Warner from Winston & Strawn.
 3                    THE COURT:  How are you?
 4                    MR. WARNER:  Good morning, your Honor.
 5                    MR. PHILLIPS:  Thank you, your Honor.
 6                    MR. RILEY:  Good morning, your Honor.  Richard
 7   Riley from Duane Morris.  And with me today is Tom Filarski
 8   and Meredith Addy from the Brinks Hofer firm for Sandoz.
 9                    THE COURT:  Yes.  Welcome all.
10                    I take it we should start with claim
11   construction, I think, rather than going into the pretrial
12   issues, unless you have decided to go in the reverse order.
13                    Have you talked about it?
14                    MR. McCANN:  I think that's fine, your Honor.
15                    THE COURT:  All right.
16                    MR. McCANN:  Good morning, your Honor.  May it
17   please the Court, our presentation should be fairly brief
18   this morning because, as the Court has seen from the Markman
19   papers, the issues are fairly straightforward, the issue is
20   fairly straightforward.
21                    THE COURT:  Well, the issue is limited.  I don't
22   know how straightforward it is.
23                    MR. McCANN:  Hopefully, I can make it more
24   straightforward, your Honor.
25                    I thought it might be helpful for the Court
```

1     just to begin with a very short introduction to this case

2     because we obviously have not talked to the case since the

3     Rule 16 conference.

4            So to begin with, if I could have the first

5     slide, please, this case is about Lumigan.  Lumigan is an

6     eye drop that's indicated for the treatment of glaucoma.

7     Glaucoma, as your Honor is probably aware, is a disease of

8     the eye that can lead to blindness.  It's thought to be

9     caused by pressure on the optic nerve caused by too much

10    fluid in someone's eye.  And that build up of fluid over

11    time raises the intraocular pressure.  That pressure causes

12    damage to the nerve over time and the person eventually goes

13    blind.

14           There are two ways, traditionally, to treat

15    glaucoma.  The first is to reduce the amount of fluid

16    building up in the eye, and the second is to increase the

17    amount of fluid being drained from the eye.  And this drug

18    Lumigan works on that second method.

19           Its active in greed is bimatoprost.  And as the

20    Court will hear at the trial, the defendants' ANDA products

21    both use bimatoprost as their active ingredient.  So it's a

22    copy of Lumigan, of Allergan's molecule.

23           Bimatoprost was developed by Allergan as a

24    prostaglandin-like drug.  I will explain as I go through my

25    presentation a little bit more about what a prostaglandin

1    is.  But it's a chemical compound.  It's a particular

2    molecule.

3                And you'll hear in the case from Allergan's

4    witnesses that Lumigan, bimatoprost has some unique

5    properties compared to other drugs in this class.  It has

6    its own distinct mechanism of action.  It has -- it's very

7    efficacious of treating IOP.  And you are going to hear

8    testimony that is the most efficacious drug available for

9    that purpose and it has its own distinct safety profile.

10   It's covered by two patents, the patents-in-suit, the '819

11   patent, and the '649 patent.  And my comments this morning

12   will be directed primarily at the '819 patent.  That's where

13   the claim construction dispute is.

14               So could I have the next slide, please?  And do

15   we have a laser pointer?

16               So, your Honor, what's depicted on this slide is

17   bimatoprost, the active ingredient of Lumigan.  And I said

18   before that bimatoprost is a prostaglandin-like molecule.  A

19   prostaglandin is a naturally occurring fatty acid in the

20   body.  Bimatoprost is a synthetic molecule that is similar

21   to the natural prostaglandin.  But there are a number of

22   important differences.

23               Just to orient the Court to the molecule itself,

24   you're going to hear today and in the trial some testimony

25   about its structure, and it's usually referred to as having

1    a hairpin formation.  The top part is called the alpha chain

2    and it has a number of carbons that I will discuss in a

3    moment.  And then this here on the left side of the molecule

4    is, that looks like a pentagon, is the cyclopentane ring.

5    It's just a chain of five carbons in that formation.  And

6    then there's an omega chain, the lower half of the molecule

7    ending in this substituent here, which is called a phenyl

8    group.

9           Now, bimatoprost has an amide at the C-1

10   position.  So first, this is the chemical structure of an

11   amide.  And when I refer to the C-1 position, your Honor,

12   I'm referring to the first carbon in the chain.  So when the

13   Court looks at the molecule, where this double bonded O is

14   here, that's the C-1.  This is C-2, C-3, C-4, C-5, and so on

15   each of these angles represents a carbon atom.

16          The methyl atom in bimatoprost is located at

17   that C-1 position.  And you're going to hear testimony in

18   the case that this ethyl amide, which happens to be the

19   subject of our claim construction disputed this morning, is

20   also very important in giving bimatoprost its unique

21   qualities.

22          The next slide, please.  We have two

23   patents-in-suit.  The first is the '819 patent.  There's one

24   asserted claim, claim 10, and there's one disputed claim

25   term.  That's this X is $N(R^4)_2$.

1              There's also the second patent, the '649 patent.

2    It has six asserted claims, claim 1 through 3.  Claim 1

3    claims the molecule, bimatoprost itself.  Claims 2 and 3 are

4    methods of use of bimatoprost for the treatment of glaucoma.

5    I should have said with respect to the '819 patent, claim 10

6    is a method of use of bimatoprost for the treatment of

7    glaucoma.

8              There are no claim construction disputes in the

9    '649 patent.  All the parties agree, all the terms should

10   just be given their ordinary meaning.  The Court might

11   wonder, we have two patents, both of which are claiming

12   bimatoprost or uses of bimatoprost.  Why do we have a claim

13   construction dispute?  I think perhaps one reason for that

14   might be the '819 patent has one year longer in its life

15   than the '649 patent.  We believe the defendants' claim

16   construction position is designed to achieve

17   noninfringement, and if they're successful in that, then

18   no matter what happens in the patent trial with respect to

19   the '649 patent, they will have saved a year off the life

20   of the patents.

21             The next slide, please.  So asserted claim 10.

22   This is from the '819 patent.

23             Now, if your Honor looks at asserted claim 10,

24   really, there are two things the Court might notice.  The

25   first is that there are five compounds listed here, each

1   beginning with the word "cyclopentane."  And if you look at

2   the fourth one down, where it says cyclopentane N-ethyl

3   heptenamide, this language here describes the molecule of

4   heptenamide.

5            There's no dispute that's what that is,

6   bimatoprost.  The Court will also notice that the claim term

7   that's in dispute here, X equals $N(R^4)_2$, is not in claim 10,

8   and that's because claim 10 depends indirectly from, or

9   depends from a number of other claims.  It depends from

10  claim 9, and in turn from claim 8, 8 from 7, 7 from 6, and 6

11  from 5, and when we get all the way back to five, we find

12  this claim term X equals $N(R^4)_2$.

13            Let's go to the next slide, please.

14            So, your Honor, this is claim 5 and this is

15  where we find the disputed claim term.  And I'm thinking

16  from where you're sitting, it might be hard for the Court to

17  see the slides.

18            THE COURT:  No.  Actually, it's fine.

19            MR. McCANN:  Because I have a copies, your

20  Honor, if that would be helpful.  And I also have a copy for

21  opposing counsel.  And I apologize for not giving you a copy

22  earlier.

23            May I approach, your Honor?

24            THE COURT:  Yes, you may.

25            (Mr. McCann handed slides to the Court.)

1           MR. McCANN:  So if your Honor looks at claim 5

2    of the patent, which is depicted on the, I think it's the

3    sixth slide, you'll see there's a diagram of a molecule,

4    and this is a prostaglandin structure that we discussed

5    before.

6           And you'll notice instead of the chemical

7    substituents, the specific chemical substituents, such as

8    the bimatoprost molecules, there are variables.  And the

9    idea is that this is a genus-type claim and there are

10   different substituents, the claim says you can place there

11   and still be within the scope of the claim.

12          And we're going to be focusing here again at

13   that C-1 position on the X variable.  And if the Court sees

14   the highlighted text, it says, X is a radical chemical group

15   selected from the group consisting of either OR4 and $N(R^4)_2$.

16          So to begin with, X could be either of these two

17   groups.  And we're going to focus on the second group that

18   bimatoprost falls under, which is this $N(R^4)_2$.

19          So it goes on to say, further describing $N(R^4)_2$,

20   where $(R^4)$ selected from a Markush group.  And there are

21   four possible substituents for the $(R^4)$ in the Markush

22   group.  The first is a hydrogen.  The second is a lower

23   alkyl radical having from one to six carbon atoms.  So

24   that's just a particular chemical group.  It can have

25   anywhere from one to six carbon atoms and then the

1    appropriate number of hydrogens that you would find on

2    an alkyl.  So that's the second element of the Markush

3    group.

4              The third is that same lower alkyl radical with

5    one to six carbon atoms where you have a carbon with a

6    double bonded O and an R5 variable, not particularly

7    relevant to our argument today, or the fourth possibility is

8    this carbon with two oxygens.

9              So bimatoprost, your Honor, has, from the

10   Markush group, the hydrogen, and it has a lower alkyl

11   radical having from one to six carbon atoms.  So it has two

12   ($R^4$) substituents.  One is the hydrogen and the second is

13   this second option, this lower alkyl radical.

14             Now, as your Honor looks at the claim, you won't

15   see anything that requires that the two ($R^4$) elements be the

16   same element.  There's nothing in here that says that both

17   must be hydrogen or both must be a lower alkyl radical, and

18   that's where the dispute is going to center today.

19             So we could have the next slide, please.

20             These are the parties' claim constructions.  And

21   so Allergan's construction, your Honor, as you are familiar

22   from the briefs, is that that term, $N(R^4)_2$, is construed to

23   mean one nitrogen atom.  That's what the N refers to.  And

24   then two ($R^4$) elements.  So ($R^4$) with a subscript $_2$,

25   indicating there are two, which need not be identical.  And

1    the defendants' construction is, when X is $N(R^4)_2$, each $(R^4)$

2    is the same member of the group.

3              And as we're going to see when we go through

4    this, your Honor, if the defendants' construction is

5    adopted, in claim 10, even though bimatoprost is

6    specifically identified as a compound claimed in claim 10,

7    if the Court adopts the defendants' construction, we'll be

8    reading bimatoprost and a number of other compounds right

9    out of that claim.

10             Now, below the construction, your Honor, I have

11   again this prostaglandin shell, and I've indicated on the

12   nitrogen, this is the $N(R^4)_2$. Again, the question is going to

13   be, do these two $(R^4)$s have to be the same, or do they -- or

14   can they be different, as I have suggested here with the

15   blue and the green squares?

16             Next slide, please.

17             So, your Honor, you are very familiar, I know,

18   with the principles of claim construction.  There's

19   intrinsic evidence which will be the claims, the

20   specification, and the file wrapper, and then if the Court

21   needs to, we can refer it to extrinsic evidence.  It's our

22   view that there's no need to do that here because the

23   intrinsic evidence is going to be quite clear.

24             So to begin with, starting with claim 10 itself.

25   Now, as the Court knows, as a dependent claim, claim 10 must

1   contain all of the elements of the claims from which it

2   depends and then add what it adds.

3           Now, when we look at claim 10, what we see is

4   the method of claim 9, and this I referred to before, your

5   Honor, depends from 8 and 7 and 6 and so on, and there are

6   five compounds specifically claimed here.  Two of them,

7   these first two, are compounds where those two ($R^4$)

8   substituents are the same, and three of them, so the

9   majority of the compounds described, are where those two

10  ($R^4$) substituents are different.  So there's an N-isopropyl

11  heptenamide, an N-ethyl heptenamide and N-methyl

12  heptenamide.

13          If we go to the next slide, I've drawn out for

14  the Court the compounds that illustrate the point.  So when

15  the Court looks at the N-isopropyl, you see there's a

16  hydrogen and you see there's this isopropyl group, these two

17  carbons with hydrogens.  That's the third compound on the

18  list.

19          The fourth compound, this is actually

20  bimatoprost.  Again, you have a hydrogen with two carbons.

21  That's just three carbons in the first one.

22          And then the fifth compound here, the third one

23  on the slide, shows a hydrogen and, again, a different ($R^4$)

24  substituent.

25          So three of the five, one of which is

1    bimatoprost, have different ($R^4$) elements, and, again, under

2    our construction, this claim makes sense.  All five

3    compounds are covered on the defendants' construction.  This

4    claim does not make sense.  Only two of the five are

5    covered.

6                The next slide, please.

7                Now, your Honor, that's the claims.  So in our

8    view, the claims themselves, when you try to -- when you

9    look at the two constructions and you reconcile what is the

10   meaning to a person of ordinary skill in the art, when you

11   look at those claims, I think it's clear that the applicants

12   intended this $N(R^4)_2$ to cover ($R^4$) substituents where they

13   could be the same, like those first two compounds, or

14   substituents where they're not the same, like the latter

15   three.

16               Now, when you turn to the specification, you see

17   the same thing.  There's a whole list of compounds

18   identified at column 9 of the patents.  I think there may be

19   17, your Honor, and three of them are these same three that

20   we saw in claim 10.  So the specification also discloses

21   compounds, some of which have identical ($R^4$) substituents

22   and some of which do not.

23               And the next slide, please.

24               Now, your Honor, turning to the file wrapper, I

25   think the parties agree that this term, $N(R^4)_2$, was not

1    discussed during the prosecution of the patent prior to its

2    issuance.  So the file wrapper really sheds no additional

3    light other than the fact that no one seemed fit to comment

4    on that in calling into question the way the patent was

5    drafted.

6           So we know there's no argument in the case that

7    there is some kind of estoppel here or any kind of clear

8    disavowal of claim scope.  Those arguments have not been

9    advanced by the defendants.  There is some evidence from

10   the file wrapper post issuance, if we can have the next

11   slide.

12          What we have, your Honor, is after the patent

13   had issued, Allergan went back to the Patent and Trademark

14   Office and said, we're marketing a drug, Lumigan, which has

15   an active ingredient, bimatoprost, which is a molecule

16   specifically disclosed and claimed in the '819 patent

17   in claim 10.  And we would like a patent term extension

18   because it has taken us some time to get to the FDA, and we

19   would like some additional time in the life of our patent

20   to sort of make up for the time it took to get regulatory

21   approval.

22          So Allergan made that submission to the FDA.

23   And if we could have the next slide, the PTO -- and the

24   PTO approved.  They said, a determination has been made

25   that the '819, which claims the method of use of Lumigan,

1    is eligible for patent term extension, and they granted the

2    extension.

3              So that is some intrinsic evidence that the

4    Patent and Trademark Office and Allergan, the applicants,

5    were -- had the same understanding as how the claim should

6    be interpreted and applied to bimatoprost.

7              So, your Honor, in summary, when you look at the

8    intrinsic evidence, the record is clear that there's no

9    requirement that the two $(R^4)$ substituents be identical.

10   That when you review the claims, just starting with that,

11   the claims themselves show that the applicant intended that

12   the $(R^4)_2$ the $(R^4)$ elements could be the same or they could

13   be different.

14             I don't think there is any need to go into

15   extrinsic evidence, and what I propose to do is, to the

16   extent that counsel addresses extrinsic evidence in their

17   remarks and the Court allows time for rebuttal, I might get

18   up and comment on that.  But I think under the law, the

19   record is fairly clear here, you can rely on the intrinsic

20   evidence alone to make your determination.  So unless the

21   Court has any questions, I will defer to counsel.

22             THE COURT:  I think I will defer my questions

23   until I hear from counsel for defendant and ask you to

24   respond to those if I need to.

25             MR. McCANN:  Thank you, your Honor.

1                    THE COURT:  Thank you, Mr. McCann.

2                    Mr. Lombardi?

3                    MR. LOMBARDI:  George Lombardi on behalf of Barr

4     and Teva, your Honor.

5                    Let's go to the next slide.

6                    Your Honor, same claim, obviously, and basically

7     the same slide that you saw before.  Let me just take one

8     moment to talk a little bit about the case, just a second.

9     I had not planned to say anything, but since counsel said

10    something.

11                   What's important in this case, in the way

12    bimatoprost works, is actually something called the

13    bimatoprost-free acid.  And the free acid is what actually

14    has the activity that is important here on a receptor in the

15    eye, and that activity on the receptor in the eye affects

16    the pressure, the intraocular pressure.  So it's this free

17    acid that is the important thing in terms of the way this

18    medicine, this drug, works.

19                   That free acid was known in the prior art and

20    was published in a patent.  And also -- and the way that

21    free acid gets to where it gets to, you don't just put the

22    free acid into the eye, because an acid causes the eye to

23    turn red and it hurts.  And so what you do is, you create

24    what's called a pro drug, and the pro drug is something

25    which your Honor may have run into in other cases.  But a

1    pro drug is something that will metabolize into the free

2    acid when it's put into the eye.

3              Now, the free acid was known in the art and pro

4    drugs for the free acid were known in the art, and

5    bimatoprost is actually a pro drug for the free acid, and

6    it's a pro drug that is one routine change away from what

7    was disclosed in the art.

8              So our position fundamentally is going to be

9    there was nothing new, novel and inventive here.  This is a

10   classic KSR-type of obviousness where there was a need to

11   move away from what was patented and the options were finite

12   and they chose one of the finite options.  So that, just in

13   short, is what you'll be hearing from us during the case.

14             But in terms of claim construction, obviously, I

15   agree completely with counsel as to what the claim term is

16   that is at issue here.  It's in claim 5, which obviously

17   moves down to claim 10, because claim 10 is a dependent

18   claim.  And it's that $R4_2$.  It's very specifically what we're

19   concerned about here.

20             And here are the term -- here is the way the two

21   parties have defined it.  As you've heard from counsel, we

22   say that ($R^4$) is the same member of the group.  ($R^4$) means

23   the same thing when you use it.  And they say that the ($R^4$)

24   can be two different things.  Counsel said there's

25   absolutely nothing in the claims to indicate that ($R^4$)

 1    should be the same thing.  I would say, other than the fact

 2    that they're called the same thing.

 3              When you label something as an $(R^4)$, it's the

 4    same thing every time you use it.  That is our fundamental

 5    position on what the ordinary meaning here is.

 6              So let's go to the next slide.

 7              Just to give you an example of that, Judge, when

 8    you use a subscript in the chemical world, for instance, you

 9    have H20, two H's, the 2 means they're two hydrogen atoms.

10    When you have CO2, the 2 means they're two oxygen atoms.  So

11    our position is where you say there are two $(R_{4)}$s, that means

12    you have two of the entity that is an $(R^4)$, not two

13    different things that could be $(R^4)$.

14              Next one, please.

15              And in the patent, it's very clear that the

16    patentee had the idea and the ability to give different

17    labels to different elements that they wanted to include in

18    the compound.  So in addition to R2, we've got R1, R3, R4 X,

19    R5, R6, R7.  Lots of different labels are given when you

20    want to have the elements be something different than $(R^4)$.

21    The fact that they kept it at $(R^4)$ indicates that that is

22    the single -- it is the single element that goes at $(R^4)$.

23    They could have named it something different.  And this is

24    taken right from the patent itself.

25              Next one, please, Kevin.

1           So if you just look at it, your Honor, as a

2      matter of common sense and common usage, the way it's

3      expressed in the patent is consistent with what we would say

4      the ordinary usage is.  You could say you want the same $(R^4)$

5      either the way it is in the patent, with that 2 in

6      subscript, or you could put $R^4$s there, and that would mean

7      two identical $(R^4)$s in either instance.  Those two on the

8      left are essentially what we're saying the options are that

9      you could use to have our construction.

10          If you wanted to do it plaintiffs' way, where

11     you were saying that the two $(R^4)$s could be different

12     things, you would do it differently.  You would give it a

13     different label.

14          So you might say N $(R^4)$ $(R^4)$ prime.  That would

15     distinguish between the two $(R^4)$s.  It would show that they

16     could be two different things.

17          You could call it something completely

18     different.  For instance, you could say $(R^4)$ or R8, or you

19     could use text that would make it clear that the $(R^4)$s could

20     be different elements.  And so we put two examples of how

21     you might state that.  And actually each of these customary

22     ways of expressing plaintiffs' construction are things that

23     we refer to in our brief from other sources just to show

24     ways that other patentees and other scientists have referred

25     to it.

1          I will just read one of the examples, your

2    Honor.  You could say, you could put $(R^4)$ with a subscript 2

3    and then say, where in one $(R^4)$ is selected from a defined

4    set and the other $(R^4)$ is selected from a defined set.  That

5    would make clear that the $(R^4)$s could be the same, or could

6    be different, but you're making it clear.  That's not the

7    way it was claimed here.  The way it was claimed here was

8    $(R^4)$ subscript 2, which indicates that the $(R^4)$ is the same,

9    you just have two of them.

10         THE COURT:  And, Mr. Lombardi, certainly,

11   patents could always be written better, but isn't it clear

12   from the specification and the dependent claims that that is

13   what the patentees meant?  I mean, that your construction is

14   inconsistent with what the patentees meant to include within

15   the scope of their invention, and so are you then back to

16   legal holdings, that when you have a Markush group, you have

17   to?

18         I mean, certainly, it could have been written

19   different, but it wasn't, so my job is to try to figure out

20   what the patentees intended.  Clearly, what the patentees

21   intended is inconsistent with what you're espousing.

22         MR. LOMBARDI:  And I understand exactly what

23   your Honor is saying, and I have some other slides which I

24   will get to.

25         I will give you a short answer right now, your

1    Honor.  They clearly did put bimatoprost in claim 10, but

2    what happened here is, fundamentally, they weren't focused

3    on bimatoprost when they were working on this patent.

4              THE COURT:  Well, isn't that the problem with

5    claim construction these days, which is why Judge Newman and

6    I have such problems with claim construction, with validity,

7    because patents aren't written as carefully as they would be

8    if they knew for sure that something within the scope of the

9    patent is going to be a commercial success and going to be

10   undergoing the scrutiny of all of you folks.

11             But, nevertheless, it's still my job to try to

12   make sense of what perhaps less than careful scripting

13   should be construed as.

14             MR. LOMBARDI:  And I understand what your Honor

15   is saying.  And I guess my response, I do have a slide on

16   this.  The response is that the Federal Circuit says that

17   when you have a plain and ordinary meaning of a claim term,

18   it's not the judge -- two job of the judge in claim

19   construction to ensure that the patent is valid.

20             Essentially, what their argument here is, that

21   if you interpret the way defendants say, then claim 10 is

22   invalid, because it doesn't set up the independent and the

23   dependent claims properly.  And what the law says is that

24   you cannot use a validity argument to overcome the ordinary

25   and plain meaning of the term.

1          THE COURT:  And I certainly understand that

2     after -- I certainly understand that, but what you all who

3     are advocates and very much invested in your clients'

4     arguments don't understand is that there's very little in

5     this area that's clear.  And so it's not necessarily clear

6     to me unless you show me, which I'm sure you're about ready

7     to, and I interrupted you.  It's not clear to me that when a

8     person of ordinary skill in the art sees the nomenclature

9     and description of $(R^4)_2$ that there's only one answer to

10    that.

11         In my world, unless you give me evidence of

12    that, then we're back to my trying to figure out what the

13    patent -- whether I can, underlying all constructs, give the

14    meaning to the patent that certainly the people who drafted

15    the patent wanted it.

16         MR. LOMBARDI:  Understood, your Honor.  And we

17    did submit an affidavit.  And let me tell you about the

18    affidavit, or declaration of Dr. Taber to testify that this

19    is the ordinary meaning.  I'm also going to show you some

20    slides that will show you extrinsic evidence that just kind

21    of confirm that.

22         On Dr. Taber what we did was, we actually -- we

23    knew they were going to disagree with us on claim

24    construction.  We did not anticipate that they would

25    disagree with us on the plain and ordinary mining.  They

1    filed their brief.  We then filed a declaration from Dr.

2    Taber, which supports our view.  They have objected to that

3    declaration, saying that we shouldn't have been able to

4    raise it in a responsive brief.

5            I disagree with that, your Honor, but I think

6    the bottom line point is here, we said to them at that time,

7    if you want to submit a declaration counter to Dr. Taber,

8    and you have somebody who will say that we're wrong about

9    the ordinary meaning, then feel free to do it.  We will not

10   object to that.  So there's no prejudice to them.  They

11   chose not to submit another declaration.  So you do have a

12   declaration in the record that says that this is the way one

13   of ordinary skill in the art would perceive it.

14           So that's the state of the record on that point.

15           THE COURT:  And we'll reach Dr. Taber's

16   declaration at a further time, but I take your point, and I

17   will let you proceed.

18           MR. LOMBARDI:  Thank you.  Thank you, your

19   Honor.

20           Let's go to the next slide, Kevin.

21           And so, your Honor, we've talked about this

22   before, and I know you know a patentee can obviously be his

23   or her own lexicographer.  That did not happen here, as

24   counsel said.  And if they're not their own lexicographer --

25   next slide, please, Kevin -- then you don't alter the

1    ordinary meaning of the terms.  There was no special

2    definition provided here in the specification on ($R^4$), so

3    you go to the meaning of the terms.

4              Let's go to the next slide, please.  Are.

5              These are Markush groups, as you've heard

6    referred to, your Honor, which just means it's a member

7    selected from a group consisting of various elements.  And

8    the law on Markush group says that the members of the

9    Markush group are to be used singly unless the patentee

10   indicates otherwise.

11             And this is the case.  We cite the Abbott case

12   here.  This is in the briefs.  And if the patentee desires

13   to have a mix of the elements, then the patentee can clearly

14   do that and say that and specify that, but that is not what

15   happened here.  They say, ($R^4$) is selected, so ($R^4$) singular

16   is selected from the group consisting of hydrogen and so

17   forth.

18             So there's nothing in the claim or in the

19   specification that indicates that there be a different

20   interpretation than the way a Markush group is typically

21   interpreted.  So we believe that the law of Markush group

22   interpretation construction also supports our view here.

23             Next slide, please, Kevin.

24             So the extrinsic evidence, your Honor, that I

25   wanted to show you that I think confirms and I hope

1    strengthens our position on what Dr. Taber says, this is a

2    patent that is not just any patent.  It's a patent that has

3    an inventor who is an inventor on the patent at issue here.

4    It has attorneys who overlap with the patent that was at

5    issue here.  And this is the way they refer to this element.

6              Now, this isn't the same drug, but it's the same

7    point.  They say $NR_5$, $R_6$, and then down in the text, they

8    say, $R_5$ and $R_6$ are selected from the group consisting of.

9              Now, so that indicates that $R_5$ is different than

10   $R_6$ and both get selected from that group.  So that would be

11   a way that you can make the claim to indicate that you can

12   have two different things.

13             THE COURT:  And in that case, would you say that

14   they could be identical?

15             MR. LOMBARDI:  They could.  They could be either

16   one.  All it says is that $R_5$ is selected from this group and

17   then $R_6$ is selected from this group.  So you can have both

18   ways.  You could have -- it's just that $R_5$ and $R_6$ are

19   different in the sense that you choose them both from the

20   same place.  You gave them a different designation.  They

21   could be the same or they could be different.

22             That's not what we have here.  What we have here

23   is just $(R^4)$.  $(R^4)$, the same thing, is selected from the

24   group.  And so that's -- this patent, which overlaps with

25   some of the personnel that were involved, indicates that

```
 1    that is the case.

 2              Let's go to the next slide.

 3              This is just a reference that was available,

 4    your Honor, at the time of the patent applications were

 5    being worked on here.  Just gives another example of how you

 6    can show that these R groups are different.  This has, if

 7    you can -- I'm not sure if you can see from that.  R prime

 8    and then R double prime.

 9              So another way of making them different.  This

10    is another instance where it indicates that R prime and R

11    double prime could be the same thing or they could be

12    different, but it indicates such by giving them different

13    designations, not calling them the same thing.

14              Next one, Kevin.

15              This is just another example from a patent, your

16    Honor, just to intend to show you that there are different

17    ways of doing this.

18              Your Honor, I do have copies of this, which I

19    neglected to pass up.

20              THE COURT:  That's okay.

21              MR. LOMBARDI:  Okay.

22              THE COURT:  I'm the one who sets the screen

23    there, so I am not complaining about it.

24              (Mr. Phillips handed slides to the Court.)

25              MR. LOMBARDI:  And we're on No. 11, if you are
```

1     trying to catch up in that group your Honor.

2              But so this is just another way that you could

3     do it.  It says $R_5$, $R_6$, $R_7$ are the same or different.  So

4     that's another way you could make clear that that is the

5     construction, that's the proper construction of the terms.

6              If we could go to the next one, please, Kevin.

7              Now, counsel talked about, and in the brief

8     there's even more discussion of preferred embodiments as

9     mentioned in the specification should not be excluded from a

10    claim construction.  And there is case law that says that an

11    interpretation that would exclude a preferred embodiment is,

12    it can happen, but you can't do it absent highly persuasive

13    evidence.

14             Now, the situation here is, this is not a

15    preferred embodiment.  Bimatoprost is not a preferred

16    embodiment.  And so let's go to the next one.

17             This is from the '819 patent, your Honor.  It's

18    column 7, lines 9 to 18.  And we cite this in our brief as

19    well.  Preferred representatives of the compounds have this

20    particular formula.  And I will focus on the X is OH.  And

21    you'll see -- let's go to the next slide -- that this X

22    equals OH is covered.  The preferred embodiment is covered

23    using our construction of these claims.

24             So the preferred embodiment down there in red on

25    the left says X is OH, and in the claim language says, X is

1    a radical selected from the group, and as you work down

2    through all of this, the X is where in the ($R^4$) is selected

3    from a group consisting of hydrogen.  So ultimately, the

4    conclusion is, X is OH.

5              The whole point of that exercise, your Honor, is

6    just to show you that the preferred embodiment is covered by

7    the claim language.  What we're doing is not excluding a

8    preferred embodiment from the claim language.

9              Next slide, please.

10             And it is -- we talked about the law about

11   typically not excluding preferred embodiments from

12   constructions, your Honor, but disclosed embodiments that

13   are not preferred are frequently excluded from claim

14   language.  The mere fact that an embodiment is in the

15   specification doesn't mean that it's necessarily covered by

16   the claim language.  And if it's not covered by the claim

17   language, it's deemed to be -- given to the public, given

18   over to the public, dedicated to the public.  And that's

19   what this Schoenhaus case says, is, just because you have a

20   disclosed embodiment doesn't mean that it necessarily gets

21   into the claims unless the claim language requires it, that

22   it be there.

23             Next slide, please.

24             This patent term, extension point, your Honor, I

25   don't remember exactly how counsel framed it, but I think he

1    said that this was part of the intrinsic evidence of the

2    meaning of the terms.  The patent term extension request

3    here has nothing to do with the Patent Office's

4    determination of the meaning of the terms.  All the patent

5    term extension requires on the part of the Patent Office is

6    an administrative act.

7              Essentially, if the plaintiffs here went to the

8    Patent Office and said, this is our drug out there on the

9    market, it's covered by this claim, they would just checked

10   that box off and that's the extent of the review.  So the

11   patent term extension of this does not add anything to the

12   construction.

13             If you could go to the next one, and the next

14   one, Kevin.

15             There is discussion in the briefs which was not

16   mentioned this morning, but it's extensively discussed in

17   the briefs, so I will just make reference here.

18             There was another case that plaintiffs cite,

19   where similar -- where similar claim language was construed

20   the way they would like it to be construed.  And our

21   position on that, Judge, and I think we are supported by the

22   law and the facts in this case, is that that really should

23   not be a factor in your decision.

24             First of all, as I think your Honor is well

25   aware, you are not bound by another District Court's

1    decision, but you're particularly not bound by another

2    District Court's decision where it was a different patent

3    involved, a different specification involved, different

4    intrinsic evidence involved, and different construction was

5    being offered by the defendant.

6              So in short, if you go to the next slide, Kevin,

7    it was a different set of circumstances that the judge in

8    this District of California case made the claim construction

9    decision that plaintiffs have gone with here.

10             And you can see specifically, while the

11   plaintiffs' construction appears to be right about the same

12   as what they are suggesting here, the defendants'

13   construction is different.  But, more importantly, your

14   Honor, what's different is the intrinsic record in the

15   case.

16             Move to the next slide, Kevin.

17             The Court considered a different intrinsic

18   record.  It was different in one very important way.  But

19   what I think is significant for your Honor to see is, that

20   judge said that our construction of $(R^4)$ was the intuitively

21   correct construction.  He said, the Court agrees that it

22   seems counter-intuitive to interpret the term to allow for

23   different $(R^4)$s, but then goes on to say that in this case,

24   the case that's being considered there, the vast weight of

25   the intrinsic evidence suggests that the two $(R^4)$ groups

1    need not be identical.

2             And what was the big difference in the intrinsic

3    evidence that was being considered?  It was the fact that in

4    that case, bimatoprost was specifically a preferred

5    embodiment.  Specifically a preferred embodiment.  And so

6    the Court cited the law that says that construing terms that

7    don't include preferred embodiments is disfavored and

8    concluded that you should construe the terms to include

9    bimatoprost, and that's how that judge concludes that you

10   would not go with the intuitively correct construction, but

11   with one that's different.

12            As I've said, your Honor, we don't have that

13   preferred embodiment situation in this case, and so that is

14   not a factor.  It makes the two cases different.

15            Next slide, please, Kevin.

16            And here I will just show your Honor so you can

17   see it.  This is the patent that was at issue in that case,

18   and it is a bimatoprost patent.  You can see it's for a

19   different method.  It ends up with a different

20   specification.  And here it says, most preferably the

21   compound is, and it gives a very long chemical name, but

22   that is bimatoprost.

23            So the preferred embodiment was bimatoprost in

24   that case.

25            Next slide, please, Kevin.

```
 1                 And, your Honor, as I said before, I won't
 2    repeat, this is the citation I referenced before about the
 3    job of the Court here is not to try to construe in order to
 4    make these claims valid.  The job is to give them their
 5    ordinary, the ordinary meaning.  And --
 6                 THE COURT:  I feel like we're going in circles
 7    here because, on the one hand, it seems to me as though one
 8    could argue that the patentees have been their own
 9    lexicographers and have made their intent clear, but I think
10    what you're telling me is that even if that were the case,
11    because this isn't a preferred embodiment, that isn't a
12    legal principle that I should hang my hat on.  It should be
13    more the ordinary meaning, et cetera.
14                 MR. LOMBARDI:  Yes.  And here's what I mean
15    by -- on the lexicographer point, in case I wasn't clear.
16                 THE COURT:  All right.
17                 MR. LOMBARDI:  They don't have a spot, and I
18    think counsel agrees with this, they don't have a spot in
19    the specification or the file history that says (R$^4$) shall
20    mean that.
21                 THE COURT:  Right.  Right.
22                 MR. LOMBARDI:  I think you understand where
23    I'm --
24                 THE COURT:  Right.  But I think one could argue
25    that they intended it that way, because of the way they set
```

1    up the whole dependent claims and mentioned in the

2    specification.  So I think it is -- but I take your point on

3    it.

4              MR. LOMBARDI:  All right.  Understood, your

5    Honor.

6              And we'll move to the next slide, then.

7              What happened with this '819 patent, just to

8    give your Honor a little bit of background is, what happened

9    was, they weren't focused really on bimatoprost.  They were

10   focused on an interference with another patent involving

11   different compounds.  And so their prosecution attorney

12   said, this was filed, this patent application was filed to

13   get claims to the Alcon compounds.  That was the whole

14   purpose of this.

15             So bimatoprost, which they have in another

16   patent in this case, by the way, your Honor, which we're not

17   contesting what's going on with the other patent, this

18   patent, it was not the focus, and they just didn't claim it

19   properly, and they should be held to that.

20             So another interesting point about this, your

21   Honor, is that they continued to work with bimatoprost in

22   other countries after this patent was filed.  And there's a

23   Canadian patent application that was filed as a foreign

24   counterpart to the '819 patent, and it claimed the same

25   priority document and so forth.  It was filed three years

1    afterwards.

2              And so here's the '819 patent on the left and

3    the Canadian patent -- excuse me.  The '819 patent on the

4    right and the Canadian patent on the left.  That's just the

5    front page.  But if you go, then, into the patent, you'll

6    see, this is the claim terms of the '819, where they do the

7    $R4_2$.  Well, they're talking about $(R^4)$ in the Canadian

8    patent.  But there, where they knew they needed to make

9    it -- where they needed to show that they could be different

10   $(R^4)$s, they stated it differently.

11             So you have CON $(R^4)$ $(R^4)$, wherein $(R^4)$ is

12   hydrogen or C-1 to C-3 alkyl, provided that at least one of

13   $(R^4)$ is C-1 to C-3 alkyl.

14             So that's the way you would have done it if you

15   wanted to make them separate.  That's the way you would have

16   done it.  They recognized it and they made that change when

17   they went to Canada for that process.

18             Your Honor, I think I've addressed Dr. Taber and

19   the procedural aspect of Dr. Taber.  You have his

20   declaration as part of -- as part of our papers and I don't

21   propose to read through it.  But in summary, he supports our

22   view on the plain and ordinary meaning of the term.

23             THE COURT:  And in terms of Dr. Taber, he was

24   not identified or part of the case until this declaration in

25   claim construction?

1              MR. LOMBARDI:  The chronology was this, your

2       Honor.  The parties filed simultaneous opening claim

3       construction briefs and then simultaneous responsive

4       briefs.  We did not disclose his declaration in the opening

5       brief.  We saw it in their brief, that they were making

6       comments that their reading was the plain and ordinary

7       meaning of the term, and so we got Dr. Taber to respond to

8       what they said.

9              Now, they obviously could have gotten somebody

10      to respond to us as well, but they didn't.  And they then

11      objected and they said that they had not had a fair chance

12      to respond to that.

13             We said, fine.  If you get somebody that you

14      want to file this, a declaration counter to this, that's

15      fine with us.  And it's still fine with us, your Honor.  If

16      they want to file something like that, that's still fine

17      with us.  And I know your Honor frequently takes the Markman

18      during the trial, and you could address it further in the

19      post-trial briefing.  So our offer to be acceptable, that is

20      still open.  But we think it was proper for us to respond to

21      what they said in their opening brief with the declaration

22      of Dr. Taber.

23             THE COURT:  And I'm not so upset about the

24      process as the fact that this wasn't one of your experts

25      that you had used throughout the course of the trial, so it

1    was someone completely unknown coming in at one of the last

2    papers filed in the case.  And that's really my concern, not

3    so much that you responded to their opening.

4              MR. LOMBARDI:  I guess given the -- in our

5    defense, I guess, your Honor, I would say given the timing

6    of this and that it was one of the last papers filed, that

7    was just the order in which it happened.  And we just used a

8    different expert.  I suppose we could have used the same

9    expert, or we can talk to those experts also in the course

10   of the trial, I mean before your Honor, about that issue.

11             But I think this was a specific claim

12   construction point and it was a very narrow issue and we

13   found him and he was able to address it.  And, again, I

14   would say, your Honor, if they would like to submit

15   something, we have absolutely no objection to that.

16             THE COURT:  All right.  Thank you very much.

17             MR. LOMBARDI:  Thank you.

18             MR. McCANN:  May I respond, your Honor?

19             THE COURT:  Mr. McCann?

20             MR. McCANN:  Your Honor, just a couple of

21   things.

22             First, in terms of the' process with Dr. Taber,

23   just to begin where Mr. Lombardi ended, Ms. Tyreus is

24   prepared to address the merits of our motion, but I had a

25   couple of comments about him.

1           First, it is curious to us why they used Dr.

2    Taber, because Dr. Mitra, who will be their main expert in

3    this case on invalidity, in his report gave an opinion on

4    claim construction.  So I'm not too sure why you needed Dr.

5    Taber in the first place.

6           The second thing about Dr. Taber that's

7    interesting, and I think it emphasizes the unfairness of

8    this kind of methodology where you put in a declaration

9    without really proper discovery on someone's opinions.  I

10   noticed, looking at Dr. Taber's declaration, that he has a

11   Bachelor of Science degree in chemistry and he has a Ph.D. I

12   think in organic chemistry.  When I look at Dr. Mitra's

13   definition of a person of ordinary skill in the art, it's a

14   degree, Bachelor's, Master's or Ph.D. in either

15   pharmaceutical chemistry, medicinal chemistry or

16   biochemistry.  No mention of regular chemistry or organic

17   chemistry.  I question whether he's even one of ordinary

18   skill in the art under Dr. Mitra's definition.

19          Dr. Mitra also requires experience with ocular

20   drug development.  And I can't tell from looking at Dr.

21   Taber's declaration whether he has any such experience.

22          So, again, we question the relevance of his

23   testimony.  We question the process.  As I say, Ms. Tyreus

24   is going to address it further, if you would like to hear

25   about it, your Honor, but I think you've made your view

1    clear.

2              A couple of other things.  It's interesting to

3    me that I said nothing at all about Judge Selna's decision

4    on that '404 patent in California.  Counsel spent probably

5    ten slides discussing it and it tends to make me think that

6    concerns them.

7              I think when you look at the extrinsic evidence

8    that has been presented, you see that sometimes the terms

9    are -- the nomenclature, the chemical nomenclature, is

10   articulated in the way that you see in the '819 patent.  The

11   '404 patent that Judge Selna viewed is another example of

12   that.  There are other times where someone uses a different

13   method.

14             I think that's probably the danger of extrinsic

15   evidence here, is there are different ways to skin this cat,

16   but when you look at this patent, what was intended here was

17   perfectly clear from the intrinsic record.  You don't have

18   to go outside.

19             Mr. Lombardi, just further on that point, had

20   this slide, your Honor, where he was discussing sort of,

21   this is how the ordinary meaning of these terms should be

22   understood and it gives us an example of $H2O$ and $CO2$.  But,

23   of course, H always means hydrogen, so you must mean two

24   hydrogens here, and O always means oxygen, so you must mean

25   two oxygens there, but the ($R^4$) is different.  The ($R^4$) could

1    be any of four things.  And the question is, can you pick

2    from only one of those four or can you use any number of the

3    four?

4              And, again, when you look at claim 10 and you

5    look at the specification, it is absolutely clear that this

6    patent intends that the $(R^4)$ could be a choice of multiple

7    things.  And it's actually not limited to just claim 10,

8    your Honor.  Claim 11 and claim 18, if you look at the set

9    up of those two claims, claim 11 is an independent claim,

10   very similar to 5, with that same X equals $N(R^{4)}{}_2$

11   nomenclature.

12             18 lists five compounds, the same five.  So

13   that's just another place in the intrinsic record where the

14   Court can see it's clear what this -- how this patent should

15   be construed.

16             One other thing just about the R variables

17   quickly.  This, again, is one of Mr. Lombardi's slides.

18   When you look at the R variables in the patent, your Honor,

19   what you see is that the Rs really indicate places on the

20   molecule; right?

21             So R1 there on the cyclopentane ring on the far

22   left, there are different things it can be, but the R1

23   indicates where you put it.  The same thing with $R_2$, same

24   thing with R3.  With respect to $(R^4)$, it's going to be

25   within that X variable.  So when you look at the patent,

1    really, what those are, variables mean is, where do you put

2    any of this group of things on this molecule.

3              A couple of other things that Mr. Lombardi said

4    I thought I would just address briefly.  He said that the

5    '819 patent was filed to force an interference.  I don't

6    believe that was in their brief.  Perhaps I'm mistaken.  But

7    he said they were not focused on bimatoprost as a compound,

8    which strikes me as interesting, because they claimed it.

9    He can say they didn't prefer bimatoprost as a compound.

10   They claimed it twice.  So I think that it is fair to say

11   that this patent was focused on bimatoprost and it claimed

12   improperly.

13             I think just in sum, your Honor, what I would

14   say is, the bulk of counsel's presentation and the bulk of

15   their brief is intended to put forward a plain and ordinary

16   meaning based on extrinsic evidence.  In other places, at

17   other times, people have done this differently, and that's

18   how you should apply that here.  And we submit you don't

19   even need to go there.  You can look at the intrinsic

20   evidence alone.  You can construe the claim the way we have

21   suggested, and that would be entirely consistent with all of

22   the other claims.  It will be entirely consistent with what

23   the specification says and entirely consistent with what the

24   file wrapper says, and so for that reason, your Honor, we

25   ask you to adopt our construction.

1                    THE COURT:  All right.  Thank you.

2                    All right.  Where do we go next?

3                    MR. LOMBARDI:  I think it's the pretrial, your

4      Honor.  And however you would like to proceed on those

5      issues.

6                    THE COURT:  All right.  Well, with respect to

7      all of the Daubert motions, you all know that they're among

8      my least favorite motions.  Actually, I'm not sure I have a

9      favorite motion.  But it strikes me that most of the motions

10     have to do with the merits of the opinion, which -- it

11     strikes me that the most reasonable thing I can do is to

12     reserve judgment and to hear the testimony.  I don't believe

13     that I am in a position, or I want to be in a position of

14     judging the merits of your arguments about these

15     individuals' qualifications to opine.  I mean, I'm not

16     someone who will spend days arguing Daubert and making

17     decisions when it's much better, especially in a bench

18     trial, to get these folks on the stand and let you

19     demonstrate to me through your cross-examination that these

20     folks are not qualified and that I should disregard their

21     opinion, give them little or no weight, even if they are

22     qualified.

23                   MR. LOMBARDI:  Your Honor, that actually was

24     going to be our suggestion this morning, that we realized it

25     would be difficult for you to make a ruling at this point,

1    certainly, kind of in a vacuum, and that is a completely

2    fine procedure with us, and I think it makes the most sense.

3    And we've reserved our right and made our point, and we can

4    develop it as the trial moves on.

5            THE COURT:  And I also wanted to mention, the

6    whole business of certification, I just wanted to say,

7    clearly, the language of our rule includes Daubert, but when

8    it comes down to the practicalities of it -- I mean, maybe

9    it has happened in your experience, that someone has come to

10   you and says, we're going to file a Daubert motion because

11   we don't think after you spent thousands of dollars on your

12   expert and based your entire case on his or her opinion,

13   that we're going to file this motion and won't you agree

14   with us?

15           I mean, I'm not sure from a practical standpoint

16   what the certification process does to help resolve the

17   Daubert kind of motion.  So I am not going to disregard the

18   motions filed based on the fact you didn't have a previous

19   discussion.

20           Now, if you believe that that discussion really

21   would help in patent cases, you need to let me know, because

22   maybe I need to tweak our local rule or tweak my own rules

23   that say, either Daubert, this is a waste of your time and

24   Daubert should be absolutely excluded so we don't have this

25   argument, or Daubert, a discussion about Daubert before

1     they're filed really would be helpful, because counsel are

2     willing to disregard their experts' opinions that they've

3     built their entire case on on the eve of trial.

4               So if anyone wants to give me your thoughts on

5     that now or through the FBA at some later point, I would be

6     very happy and interested.

7               MR. LOMBARDI:  I would say, your Honor, I have

8     never seen and cannot imagine a situation where a meet and

9     confer on Daubert would have any effect.  I'm agreeing with

10    what you have said.

11              MR. McCANN:  Your Honor, just briefly, I will

12    disagree and say I can imagine a circumstance, and it has to

13    do with one party has a view of how the expert is going to

14    testify and argues they're not qualified to give that

15    opinion.  And when you have a discussion and a proffer and

16    say, this is what this person will testify to at the trial,

17    I think sometimes you can narrow disputes.  But as the Court

18    said, perhaps it's something to be taken up in another forum

19    on another day.

20              THE COURT:  Well, I certainly would like to

21    think that the process works that way.  I've just never been

22    advised that it has.  So we should think about that, because

23    I don't like Daubert motions.  I find most of them not --

24    I've only granted one in part, and I will never live it

25    down, I'm sure.  So it's generally not a productive way to

```
 1    use my time.  So maybe it's something we should think about
 2    about flushing out in another forum, as Mr. McCann said.
 3              All right.  So the Daubert motions, I'm going to
 4    reserve judgment, but I will consider them at the end of the
 5    day if you believe in post-trial briefing based on evidence
 6    that you've brought forward that they really deserve, if you
 7    don't mention them, then they'll be obviously denied without
 8    any further explanation.
 9              So we have, which counsel very graciously
10    pointed out to me, if I can find it again, in the pretrial
11    order, there are issues of fact.  I'm so used to having
12    pretrial orders divided that when I was just forced to look
13    at this, I kind of missed your evidentiary issues.  But I
14    have found them and reviewed them and I appreciate your
15    pointing them out to me.
16              So are there issues we should address before --
17    oh, schedule.  And I had printed one out.  I really would
18    like to use Monday, unless you're telling me that you really
19    can't do it.
20              MR. LOMBARDI:  We will be here, if you want to
21    do it Monday, your Honor.  The issue for us is that the
22    date was set months ago and all of us are coming from out
23    of town, and so we have to make hotel arrangements in
24    advance.
25              THE COURT:  Were you coming in on Monday?
```

1            MR. LOMBARDI:  No.  No.  No, no, absolutely not.

2     Absolutely not.  We will be here on Monday, but we would

3     have left at least a day earlier had we known Monday, and

4     this will require us to move some witness things around to

5     get them.  But if your Honor would like to use the day on

6     Monday, absolutely, we'll do that.

7            The one thing I was going to say on this, Judge,

8     is, we don't -- we don't think you need to do anything

9     extraordinary to do it in the four trial days.  We're

10    totally comfortable doing it within normal court schedule,

11    not starting early, not running late, and just dividing that

12    for the four days, Tuesday to Friday.

13           So we don't think we need a fifth day and we

14    don't think we need four long days to do it, just four

15    regular days.  But if your Honor, if it's your Honor's

16    preference to start on Monday, as I say, we will be here and

17    we'll make it work.

18           THE COURT:  Well, let's talk about the schedule.

19    There are two issues -- I have a parent issue, so let's take

20    a break and make you can talk about how much time I need to

21    give you.

22           (Short recess taken.)

23                        -  -  -

24           (Proceedings resumed after the short recess.)

25           MS. BROOKS:  Your Honor, do you want to discuss

1    scheduling?

2               THE COURT:  Yes.

3               MS. BROOKS:  Good morning, us.

4               THE COURT:  Good morning.

5               MS. BROOKS:  Just to give the Court a little bit

6    of history of how we got to this schedule, your Honor may

7    recall, we originally were scheduled for a one week, a

8    five-day trial, against just Barr, and then Sandoz was added

9    to the case, and so the trial date was continued.  And when

10   your Honor continued it, you continued it to start on

11   Tuesday, February 1st, with a caveat, and I believe it's

12   even in your scheduling order, that we would go long days

13   for four days to make up for the fact that your Honor

14   already had something scheduled for January 31st.

15              But you did specifically at that point say that

16   if the 31st opened up, we would start on the 31st.  And so,

17   in fact, I put a big question mark on the 31st so that I

18   would make sure that I didn't have any conflicts with that

19   day.

20              So it was always contemplated, your Honor, that

21   even when it was just one defendant, Barr, that we would

22   have a full five days, which comes out to about 15 hours per

23   side trial.  And now we have a second defendant, Sandoz, and

24   yet what the defendants are arguing is, we should somehow

25   cut from a five full day trial days with one defendant to

1    four regular trial days with two defendants, which obviously

2    we cannot do.  We've already budgeted out our time for our

3    witnesses.  We've got it down to about two minutes to spare

4    with those 15 hours.  So we would ask your Honor, if at all

5    possible, that we be given those five days.

6            THE COURT:  Well, I wasn't going to give you

7    15 hours apiece with the schedule I had, even with Monday,

8    so let me see what's going on.

9            MR. LOMBARDI:  May I address this, your Honor,

10   just briefly?  Am I all right here, or would you prefer me

11   at the podium?

12           THE COURT:  You're fine there as long as I can

13   hear you.

14           MR. LOMBARDI:  Okay.  Here's how, just so you

15   see what the trial looks like, your Honor.  This is

16   basically a validity case.  The infringement issue that is

17   to be determined turns on Markman, and if we win Markman, we

18   won't infringe.  If we lose Markman, we will infringe.

19           We're not going to put on witnesses to talk

20   about infringement.  We can formalize some kind of

21   stipulation with the other side, which we have not done yet,

22   but that's what the infringement case is.  It comes down to

23   the Markman ruling.  So we're not going to have a lot of

24   witnesses on infringement.  So this is a validity case, and

25   the fact that there's a second defendant makes absolutely no

1    difference in the length of this case.

2              If they had to put on a lengthy case on

3    infringement for Sandoz, which is different than the case

4    they put on for Barr/Teva, then perhaps, but that's not the

5    situation here.

6              We are working together.  We're presenting

7    witnesses together.  It won't make any difference in the

8    length of the case.

9              We are prepared to go forward on the four days

10   with whatever the hours are your Honor deems to be

11   appropriate.  We certainly thought that 12 hours would be

12   appropriate or sufficient for each side under those

13   circumstances to provide -- to present our invalidity case.

14             And so that's what we said.  But having said

15   that, your Honor, if you want us here on Monday, we will be

16   here.  We have also made plans with witnesses and we made

17   assumptions about when people would need to be here.  These

18   are doctors who have other things going on and so we've got

19   their commitments to be here at certain times based on our

20   best guess of what's happening.

21             If we do need to start on Monday, we may need

22   the Court's indulgence in calling people out of order, which

23   I know your Honor has been willing to do in the past, and if

24   your Honor is willing to do that under these circumstances,

25   that's how we could make a Monday start work.  But we will

1    need to leave here today and call the people and line that

2    up, and it may be that we just can't get people here right

3    the time we would ordinarily come.

4             THE COURT:  All right.  Well, let me give you

5    the trial schedule that I had come up with and somehow

6    didn't manage to print out for you.

7             I had us starting on Monday from 9:30 to 4:30.

8    Tuesday, from 9:30 to 4:30.  Wednesday, 9:30 to 4:30.

9    Thursday is my birthday, and I remember telling you that I

10   had reserved the week, but because you're all such wonderful

11   people, I was going to share my birthday week with you.  But

12   I am going to take a two-hour lunch on my birthday.  So we

13   go from 9:00 to 12:30 and from 2:30 to 5:00.

14            Friday, because of lead counsel in another

15   patent case getting a concussion, I had to reschedule their

16   oral argument on Markman and summary judgment, so I've got

17   that on Friday.  I will give you first dibs as to whether

18   you want the morning slot or the afternoon slot.  I would

19   assume you would want the morning slot so you can get the

20   heck out of town.  And I put you down for 9:00 to 12:30, and

21   I will move that oral argument to the afternoon.  That gives

22   you each 13 hours.  I mean, plaintiff and defendants

23   collectively.

24            Now, if anyone really thinks that's a problem, I

25   can go longer on one or two days, but if infringement really

1   isn't going to be an issue, I'm not confident that is

2   absolutely necessary.  And we can play that by ear, to some

3   extent.

4            MS. BROOKS:  We will do our absolute best, your

5   Honor.  The one sort of complicating factor is that these

6   patents are a combination of biology and chemistry, and so

7   normally where we might be able to call just one inventor,

8   we really can't here.  We're going to have to call at least

9   a biologist and at least a chemist.  So it does complicate

10  it a little bit, but we'll do our absolute best.

11           I think your Honor saw Mr. Marsden do a five-

12  minute secondary consideration direct examination and, if

13  necessary, we can do something like that again.

14           THE COURT:  All right.  Well, let's see how we

15  go on Monday, and if it already looks like we're slipping,

16  we can add time on Tuesday and Wednesday, and even Friday.

17  Not on Thursday, though.  I draw the line at that.

18           Okay.  What I will do is I will print this out,

19  and if you just give me a minute, I will print it out at my

20  remote printer so that you can take away copies, and we'll

21  start with this.  It's not written in stone, but we'll start

22  with it and see where we go from there.

23           Thank you.

24           MS. BROOKS:  And, your Honor, if I could just,

25  before we leave claim construction --

1                    THE COURT:  Yes?

2                    MS. BROOKS:  -- there was one slide that defense

3       counsel showed your Honor and I had actually defended the

4       deposition of the prosecuting attorney, Mr. Baran.  I

5       couldn't see the screen from where I was siting.

6                    I was thinking to myself, I don't think he said

7       that the '819 patent was filed to force an interference,

8       that there were certain claims of the patent that were filed

9       forcing interference.  And sure enough, if you look at

10      what's not highlighted here, the question was this.  Forget

11      the ocular hypertension claims, which is the ones we're

12      talking about here.  But the claims relating to these other

13      disorders we've been discussing, you were concerned enough

14      about that to get that the patient issued -- to get a claim

15      issued covering that.

16                   He says, no, I disagree.  This was filed to the

17      claims of the Alcon compound.  That was the whole purpose of

18      this.

19                   So he wasn't talking about these claims in the

20      bimatoprost.  He was talking about other claims within the

21      '819 that are not at issue in this case that were, indeed,

22      filed for the purpose of trying to cause an interference.

23      So I just wanted to clear that up.

24                   THE COURT:  All right.  Thank you very much, Ms.

25      Brooks.

1            All right.  If we're looking at page 11 and

2     Allergan's issues, it seems to me -- all right.  The

3     schedule.  It seems to me as though many of these issues are

4     more or less moot, but if counsel for Allergan want to

5     address the ones that are not, we should do that.

6            MR. McCANN:  Thank you, your Honor.  Just going

7     in order, I have the first one.  We've sort of divided it

8     among our people.

9            Your Honor has heard, I think, that branded

10    companies ask for this in other cases.  The first issue

11    relates to some kind of notice that there's going to be a

12    launch at risk.

13           Your Honor, just to make it as simple as

14    possible, the concern for the branded company is the

15    30-month stay is close to expiring.  We don't really feel

16    it's appropriate for us to ask the Court when are you going

17    to issue your opinion.

18           And so what we end up doing is we prepare our

19    preliminary injunction papers in case we need them, which is

20    an expensive thing to do.  That would be obviated if the

21    defendants were willing to tell us at least for X period of

22    time, we do not plan to launch at risk, so there's no need

23    for anyone to go right into court with P.I. papers at the

24    time that the 30-month stay actually does elapse.

25           So we put in 60 days here, your Honor.

1    Actually, it will be less than that.

2           I think our point is if we could have some kind

3    of status or understanding of what their intentions are,

4    that would eliminate having us to prepare what is actually a

5    fairly expensive set of motion papers in order to get an

6    injunction in case we feel like we need one.

7           THE COURT:  All right.  And I think for the

8    first time, because I wasn't clear on when the time elapsed,

9    I did leave -- let a deadline go past, which I had never

10   done before.  And it has been complicated.

11          So let's hear from defendants on this point.  I

12   don't think it's the June 18th date.  It's the September

13   26th, 2011 date that we are concerned about.

14          MR. LOMBARDI:  That's right, your Honor.  And

15   our position would be that there is lots of time before

16   there's any issue about this that could arise, that this is

17   premature at this point.  And so that we would ask your

18   Honor, we'll go through the trial and we'll see if we need

19   to even reach agreement on this at some point.  But right

20   now, we're talking about something that's down the road in

21   September, and to enter provisions like this at this point

22   is, in our view, not necessary.

23          THE COURT:  All right.  Let's all think about,

24   however, in terms of post-trial briefing, whether in that

25   schedule we should include an informal status conference

1    some time at least 30 days before September 26th.

2              MR. McCANN:  That would be very helpful, your

3    Honor.

4              THE COURT:  All right.  All right.  What is next

5    here?

6              MR. SINGER:  Good morning, your Honor.  It's

7    nice to see you again.

8              THE COURT:  Good morning.

9              MR. SINGER:  I have the next two issues, which

10   are essentially directed to opinions outside the scope of

11   the expert report.

12             I think defendants have made the same issue for

13   us, and also the 282 statement here, which I think has over

14   275 references on it.

15             We understand your rule to be that if you go

16   outside your expert report, it's at your peril with respect

17   to these types of issues.  And that's the basis for our

18   objection, is they go outside the expert report on opinion

19   that's not otherwise disclosed properly, that it's at their

20   peril with respect to both the 282 statement with its

21   endless list of references as well as their expert reports.

22             THE COURT:  And you're absolutely correct.  And

23   that goes for the defendants' issue as well.

24             MR. SINGER:  Thank you.

25             THE COURT:  All right.  With respect to

1    Dr. Taber, I guess the question is, I am concerned that

2    instead of -- that this was an issue that apparently was not

3    addressed by the retained experts, that everyone was

4    familiar with and could vet during discovery.

5            On the other hand, claim construction, there

6    isn't a burden of proof.  It's my responsibility, even if I

7    didn't ask you to give me anything, it would still be my

8    responsibility to come up with the best claim construction I

9    can based on the intrinsic evidence primarily, extrinsic

10   evidence, if it's helpful.

11           And so the question is, on the assumption that I

12   will at least glance at the Taber declaration, is there

13   anything that plaintiff would want to do, as is enumerated

14   in your -- do you want to take his deposition?  Do you want

15   to call someone else and respond?  So I mean, is your

16   position all or nothing?  Either I strike it or it just

17   comes in?

18           Mr. McCann?

19           MR. McCANN:  If I could have one minute, your

20   Honor?

21           THE COURT:  Absolutely.  Take your time.

22           MR. McCANN:  Your Honor, our view is, with a

23   week to go to trial, we don't really think we have the time

24   to take a deposition.  What we would like, then, is the

25   opportunity to have Dr. MacDonald, who is our expert on

1    infringement and invalidity, give his views of claim

2    construction during his testimony.  And that will be our

3    rebuttal to Dr. Taber's opinion.  It will be the same as

4    having him submit a declaration.

5              THE COURT:  All right.  If I say okay, I guess

6    the question is whether we should at least require a proffer

7    or a declaration so at least there's some heads-up on what

8    the cross should probably be.

9              MR. McCANN:  He was deposed on claim

10   construction, your Honor, so I think they already have

11   that.

12             THE COURT:  But on the issue of ordinary meaning

13   of this, would a person of ordinary --

14             MR. LOMBARDI:  No.

15             MR. McCANN:  He was deposed -- I was defending

16   it.  I believe he was deposed on his understanding of claim

17   construction.  He was asked, do you have your own opinion?

18   He said he did, and it was explored at length in his

19   deposition.

20             MR. LOMBARDI:  I wasn't at the deposition, your

21   Honor.  My understanding is that this issue was not

22   disclosed.  We would ask just for a declaration or a mini

23   report, as your Honor suggested, just to give us a heads-up.

24   We're not asking to take his deposition in advance, but just

25   some heads-up on what his testimony is.

1          THE COURT:  Well, unless the specific issue was

2     addressed, I think it is appropriate to give some kind of

3     proffer.  I don't think it has to be a report or even a

4     declaration.

5          MR. McCANN:  We'll do that, your Honor.

6          THE COURT:  48 hours before he testifies.

7          MR. McCANN:  We will do that, your Honor.

8          THE COURT:  All right.  Thank you very much.

9          MR. McCANN:  Thank you.

10         THE COURT:  And what's this use of deposition

11    designations of your own fact witnesses?  This is all --

12    it's raised from both sides.  That's just your listing fact

13    witnesses at this point, because you don't know who is going

14    to come?  I don't know.

15         MS. TYREUS:  I will address this very quickly,

16    your Honor.  Martina Tyreus for Allergan.

17         THE COURT:  Yes.

18         MS. TYREUS:  This was raised by defendants

19    initially and we are designating testimony.  We're bringing

20    several live witnesses as well.  Most of our witnesses live

21    in California and Colorado.  Defendants have two witnesses

22    who they have designated testimony for who are within the

23    hundred miles, which is what the Federal Rules would require

24    them to come testify live.

25              We're willing to, in an effort to streamline

1    trial and save time, we want to use as much deposition

2    testimony as possible.  And that's our position, and we're

3    bringing several live witnesses, and as long as defendants

4    don't have a problem with that?  I mean, they have two

5    witnesses, I guess, that we would request that they bring

6    live if they're going to require us.

7                   THE COURT:  All right.

8                   MR. LOMBARDI:  I don't think we have a problem.

9                   THE COURT:  Okay.  Good.  I was hoping you

10   weren't meaning to do both, bring them live and read their

11   depositions.  All right.

12                  Next issue?  I think I've addressed some of

13   these.

14                  MR. McCANN:  I think on No. 9, your Honor, on

15   page 13, you've already addressed that one.

16                  THE COURT:  Right.

17                  MR. McCANN:  I think you've addressed No. 10.

18   I mean, I guess the distinction with No. 10 is both sides

19   have raised this issue of, you know, an expert, one expert

20   who testifies should not testify in a duplicative manner to

21   another expert who testifies, and I think that we only have

22   so much time and there's certainly a huge incentive not to

23   do that to be wasteful.  I mean, some of these areas do

24   overlap and I think there will be a little bit of overlap.

25   I don't think it's much of an issue.

1            THE COURT:  I don't think this is certainly as

2    much an issue with a timed time and a bench trial, where a

3    jury is hearing a different expert saying the same thing

4    over and over again.  So I would hope you could all work

5    that out.

6            MR. McCANN:  I think the next one, your Honor,

7    is No. 11.  Address the interrogatory responses.  Ms. Brooks

8    will speak to that.

9            THE COURT:  All right.

10            MS. BROOKS:  Yes, your Honor.  Defendants have

11    objected to us proffering any evidence that we are entitled

12    to a priority date earlier than September 21st, 1992.  And

13    they're saying that that is based on insufficient

14    interrogatory responses on our part.

15            Just to clarify, your Honor, as far as our

16    conception is concerned, we gave one, two, three, four -- a

17    five-page interrogatory response on this issue, where we

18    detailed how the work began in this case by at least the

19    mid eighties and that Allergan documents indicate that

20    Allergan's inventive team, which included the various listed

21    inventors, Dr. Woodward, Garst, Burk and Andrews, had

22    pursued two approaches to developing the prostaglandin based

23    drug.

24            One approach was to do, as defendants have

25    described, develop a pro drug, but the other approach was to

1    do just the opposite and do a non-pro drug design.  And it's

2    our contention that is what bimatoprost is, and that that is

3    what eventually led to the invention in this case.  The work

4    beginning in the mid-1980s.

5            It also shows our internal documents' very early

6    testing, and this is all in our interrogatory response,

7    again, including the listed inventors where it was observed

8    that if you modify -- there was a modification at the C-1

9    position, what would happen.

10           It goes on to detail various dates, various

11   documents, various work, documents indicating around

12   mid-1991, the chemists, now Burk and Andrews, had divided up

13   the particular work on these particular non-pro drug targets

14   and had actually synthesized them, and all of this work took

15   place prior to September 21st, 1992.

16           So we certainly do intend to try to introduce

17   all of this evidence before your Honor so you can get a full

18   picture and make a determination as to when the actual

19   conception and reduction to practice occurred.

20           THE COURT:  All right.

21           MS. ADDY:  Good morning, your Honor.  Meredith

22   Addy.

23           We're not saying they can't get the evidence in.

24   We're saying that their interrogatories, their answers to

25   our interrogatories were a bit of a moving target.

1            In their first answer, they said their invention

2      date was their filing date, which was September 21st, 1992,

3      and then after that, they amended and they said conception

4      at least as of January of '92.

5            They never used the word "invention" date.  And

6      as you know, invention is conception and reduction to

7      practice.  So there are different steps that are this.  Yes,

8      they gave a narrative, as we just heard, but they never used

9      the word "invention," and at this point, we need to know

10     what that date is, and we're not at a point where we have to

11     be looking around for that date.

12           To assert a different invention date right

13     before trial is prejudicial to us and that bears on our

14     expert reports.  So at this point, that's not what we need

15     to be doing.

16           Thanks.

17           THE COURT:  All right.  So we have the story?

18     We don't actually have an alternate date.  Is that actually

19     the case?

20           MS. ADDY:  That's right, your Honor.

21           THE COURT:  Ms. Brooks?

22           MS. BROOKS:  Your Honor, what we said in our

23     interrogatory response is that the invention date was no

24     later than September 21st, 1992, which was when the initial

25     application was filed in this case.  And I think what we're

1    really arguing about is the conception date and we'll have

2    lengthy testimony surrounding all of those issues.

3              THE COURT:  All right.  Is that helpful?

4              MS. ADDY:  That's helpful.  The invention date

5    is what we're looking for.

6              THE COURT:  All right.  Any other issues from

7    Allergan?

8              MR. McCANN:  Your Honor, just one.  I think item

9    No. 12 should not be an issue in the pretrial order.  If it

10   becomes one, I will say something.

11             One issue, it's not in the pretrial order, so

12   what I want to do is just make a record of it, but really I

13   think it should be taken up at another time.

14             Dr. Sherman is an expert for the defendants and

15   he's going to talk about receptor pharmacology.  And during

16   his deposition, one of the things he testified to was he's

17   currently working on some projects related to receptor

18   pharmacology that are confidential, which I certainly

19   understand and respect.

20             And Mr. Graham, who is not here, and I had a

21   colloquy on the record he would not rely on experience that

22   he gained that was confidential in giving his expert

23   opinion.  He could rely on other things, not that part.  I

24   don't know that this is the time to take it up.  Again, Mr.

25   Graham is not here.  I'm sure they're still working on

1    developing how Dr. Sherman's testimony is going to play out.

2    I would merely make a note of it.  I think no judge likes to

3    be surprised with issues.  If there is some concern that

4    he's relying on expertise gained from a project that there

5    could be some discovery on but not complete discovery on

6    because of its confidential nature, we would want to bring

7    that to the attention of the Court.

8              THE COURT:  All right.  Thank you.

9              All right.  Let's move on to defendants' issues.

10             MR. LOMBARDI:  And, your Honor, I think, as I

11   look at it, I think the first six have been dealt with.  The

12   others are kind of a common type of issue.

13             Just in general, your Honor, we're trying to

14   flag what I would describe as evidentiary-type issues for

15   the Court.

16             We will do this whichever way you'd like.  We're

17   happy to get up and give you a preview of those issues.  We

18   also recognize that it is not probably going to be possible

19   for you to make a ruling on any of these at this point and

20   you'll want to see how the evidence comes in.  So if you

21   would like to get a preview of these points now, we're happy

22   to give it to you.  Otherwise, we fully expect that it will

23   play out as the case goes on.

24             THE COURT:  Well, why don't we move on to any

25   other -- are there any other issues that are more specific?

1    Otherwise, it might be helpful to have a preview, just to

2    make sure that plaintiff understands how these issues might

3    play out in the course of the trial.

4            MR. LOMBARDI:  And there are no other issues

5    that we would raise, so if that works, your Honor, we'll

6    give you a quick preview to make these brief arguments.

7            THE COURT:  Sure.

8            MR. LOMBARDI:  Brief discussion.  I think

9    starting with No. 7, your Honor.

10           THE COURT:  All right.

11           MR. WARNER:  Good morning, your Honor.  Kevin

12   Warner on behalf of defendants Barr and Teva.

13           For Paragraph No. 7 in the pretrial order, this

14   is a ruling precluding plaintiff from proffering testimony

15   about the superiority of Lumigan, which, again, Lumigan is

16   the brand name of Allergan's product.

17           The issue here is that in late 2005, the Food &

18   Drug Administration issued warning letters to Allergan that

19   their marketing materials were false or misleading because

20   they were making claims of superiority to doctors and to the

21   public in their marketing materials.

22           In response to that, Allergan sent a, what we

23   call a Dear Doctor letter to these doctors and the patients,

24   confirming to the public the FDA's conclusion that it is

25   false or misleading for Allergan to claim that their product

1    Lumigan is superior to the prior art products or any other

2    treatments for glaucoma.

3              And what we're looking for here is a ruling that

4    they should not now be allowed to come in to trial and put

5    in evidence to the Court that is contrary to what the FDA

6    has concluded and is directly contrary to what they have

7    told the public.  And that's the gist of our issue there.

8              THE COURT:  All right.  I don't know whether

9    plaintiff feels compelled to respond since we're just having

10   the general discussion at this point.

11             MR. THOMAS:  Thank you, your Honor.  Jeff

12   Thomas.

13             Just to give you a quick preview here, the key

14   issue on which we are going to be introducing evidence is

15   that there is a subpopulation of glaucoma patients for whom

16   Lumigan is the only drug that works.  It keeps these folks

17   from going blind because it works in a different way.  A

18   subpopulation, not the entire population.

19             The FDA has never made any proclamation of any

20   kind that this subpopulation of glaucoma patients who

21   desperately need Lumigan doesn't exist.  So what the FDA has

22   said is not inconsistent with our bottom line position

23   that's relevant here for the validity of these patents.

24             Now, it is true that some of our experts take

25   issue with some statements that the FDA has made over time.

1    The FDA has made some statements that we don't think you've

2    done superiority studies that meet our regulations that

3    allow you to go out and start putting out marketing

4    materials on the superiority of Lumigan.

5              And we do take issue with some of the factual

6    and scientific statements that the FDA has made.  But the

7    FDA has not reached any conclusion on the bottom line issue

8    here.

9              In addition, this very argument that it should

10   be precluded because of what the FDA has said has come up in

11   other cases.  And what the courts have said is the FDA's

12   view is just one factor.  It's not determinative.  It's not

13   decisive.  They come at this from a regulatory perspective,

14   not necessarily a scientific perspective.  And so anything

15   the FDA has said goes to the weight of the evidence, not its

16   admissibility.

17             THE COURT:  And I would think that is

18   appropriate, and given the fact that defendants aren't

19   necessarily arguing today that I have the information I need

20   to preclude it, I assume you agree that I should -- I don't

21   know whether you do, but it seems to me the FDA has a

22   completely different basis on making its statements, and

23   that if this were brought to me today, I would deny your

24   motion for precluding as opposed to arguing that it has some

25   weight or no weight at all.

1        MR. WARNER:  Well, we would argue that the FDA

2   is basing on the same evidence and the articles that their

3   expert --

4        THE COURT:  The problem is, I need to hear that

5   evidence in order to determine whether you're right or not.

6   So having a motion in limine precluding something before

7   I've heard the evidence does not make a whole lot of sense

8   to me.

9        MR. WARNER:  That's correct.

10        THE COURT:  All right.

11        MR. WARNER:  Just very briefly, your Honor,

12   continuing on the preview line, there are a few of these

13   that we can probably group together that relate to, we'll be

14   asking to preclude testimony regarding any nexus between

15   alleged unexpected results or commercial success that their

16   experts will provide.  They don't have a basis for doing so

17   in their report.  To the extent their fact witnesses try to

18   do that, they've conceded in briefing in their own expert

19   reports that they do think it's the subject of expert

20   testimony, not lay opinion testimony.  So that takes care of

21   a number of those issues, just to preview the absence of a

22   nexus between any of the offered opinions on unexpected

23   results and commercial success.

24        THE COURT:  All right.

25        MR. THOMAS:  Very briefly, your Honor, the only

1   active ingredient in Lumigan is bimatoprost.  Bimatoprost is

2   claimed by name as a specific compound in both of these

3   patents.

4          In addition, the method of using bimatoprost to

5   treat glaucoma is covered by the claims in these patents.

6   And we certainly do intend to offer evidence on the

7   commercial success of Lumigan and the way in which Lumigan

8   has filled a long-felt need.  The nexus could not be closer

9   between an active ingredient and a drug and a patent that

10  covers that active ingredient.

11         The other factor that they have raised which

12  cuts across I think all of these motions or limine issues

13  they've raised is a notion that, well, the unexpected

14  results and the special properties and the uniqueness of

15  Lumigan on which we're going to offer evidence isn't found

16  in the claim language itself, that there must be some nexus

17  between the claim language and the unexpected results and

18  unique properties.

19         With respect, your Honor, there is no such legal

20  rule.  The books are full of cases where compound patents

21  were found to be nonobvious based on unexpected results and

22  unique properties of the compound, where the claim language

23  itself simply claims the molecule or the method of using the

24  molecule for the disease in question.

25         So this legal principle -- and the Federal

1  Circuit has said over and over again, a molecule and its

2  properties and its uniqueness are inseparable.  So this

3  notion that it cuts across these in limine arguments, there

4  has to be claim language that specifically describes the

5  unexpected results, again, in the claims themselves, that

6  requirement just does not exist.

7          THE COURT:  So, once again, listen to the

8  evidence, read the post-trial briefing to see who is right

9  on the law, who is more correct on the law.

10          MR. THOMAS:  That would be perfect.

11          THE COURT:  All right.

12          MR. THOMAS:  Thank you.

13          THE COURT:  Anything else that would be of help?

14          MS. ADDY:  I think we have a couple more, your

15  Honor.  This is No. 9.  And defendants are seeking a motion

16  precluding evidence on copying as a secondary consideration.

17          In this case, copying is not appropriate as a

18  secondary consideration because the Hatch-Waxman statute

19  requires ANDA applicants to demonstrate bioequivalents

20  between the generic and the branded products.  Therefore,

21  evidence of copying would be inapplicable in this context.

22          Specifically, there's the Purdue Pharma case out

23  of this district that is instructive, and there, in the same

24  context, an ANDA case, the Court found that such evidence

25  was not compelling.  That's at 642 F Supp. 2d, 329.

1              THE COURT:  All right.  And I think the Federal

2     Circuit has held basically that evidence of copying is less

3     than compelling in an ANDA context.  So I don't know whether

4     this is a big part of the plaintiffs' case?

5              MR. SINGER:  I will address it very briefly.

6     It's not a big part of plaintiffs' case, but actually it's

7     very interesting in this case.  I think what the cases say

8     is simply asserting copying and just sort of waving your

9     hands, that that is not compelling.  That's the Purdue

10    case.

11             Judge Farnan actually in the Lexapro case

12    pointed out when copying is important in the ANDA context,

13    and when it is important is when there are other options for

14    defendants to sell drugs in the class.

15             Mr. McCann talked about prostaglandins, and

16    while bimatoprost is a prostamide, and we'll explain what

17    that is, it's in that class of drugs of prostaglandins, and

18    there are other prostaglandins that defendants could sell.

19             And, in fact, both defendants, you will hear

20    evidence, have filed ANDAs for other prostaglandins.

21    Specifically, Zalentin, which expires, the patents on which

22    expire in a few weeks.

23             So they are here going to say to you at trial

24    that this is no better than Zalentin, it's no different than

25    Zalentin, yet at the same time, they are seeking ANDAs and

 1    spending millions of dollars to try to invalidate the

 2    patent.  And that's the circumstance where Judge Farnan

 3    indicated in the Lexapro case that the copying can be

 4    important evidence in the ANDA.

 5              THE COURT:  All right.  Well, I will certainly

 6    let the evidence in, and we'll see whether it requires to be

 7    given any weight under the specific circumstances of the

 8    case.

 9              Are there any other issues at this point?

10              MR. LOMBARDI:  That is all.

11              THE COURT:  All right.  Anything in terms of

12    setting up?  Anything else?  Any practical concerns at this

13    point?

14              MR. McCANN:  No, your Honor.  In terms of

15    courtroom setup, we'll certainly coordinate with your

16    chambers staff and deputy clerk to make sure we have

17    everything done before the start of trial.

18              THE COURT:  All right.  All right.  Looking

19    forward to see you all next week.  Thank you very much.  And

20    I will probably enjoy the rest of my week more than you

21    will.  Thank you.

22              (Counsel respond, "Thank you, your Honor.")

23              (Court recessed at 11:23 a.m.)

24                        -  -  -

25